UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

RODNEY MABRY,

       Plaintiff,

vs.                                               Case No. 2:06-CV-12076

DR. DANIEL FREEMAN, DR.
ARTURO ANTONINI, DR. UMESH          HON. LAWRENCE P. ZATKOFF
VERMA, DR. ROCCO DeMASI
and DR. CRAIG HUTCHINSON,
Jointly and Severally,

       Defendants.
                                      /

**OPINION AND ORDER**

AT A SESSION of said Court, held in the United States Courthouse,
in the City of Port Huron, State of Michigan, on August 15, 2007

PRESENT: THE HONORABLE LAWRENCE P. ZATKOFF
UNITED STATES DISTRICT JUDGE

**I. INTRODUCTION**

This matter is before the Court on Defendants' Motions for Summary Judgment (Docket #41, 44). Defendants Freeman and Verma filed their motion on June 20, 2007, and Defendants Antonini, DeMasi, and Hutchinson filed their motion on June 22, 2007. Plaintiff responded to the former motion but not the latter. Defendants Antonini, Hutchinson and DeMasi have since replied. The parties have provided copious documents in support of their briefs. The Court finds that the facts and legal arguments are adequately presented in the parties' papers and the decision process would not be significantly aided by oral argument. Therefore, pursuant to E.D. MICH. LR 7.1(e)(2), it is hereby ORDERED that the motions be resolved on the briefs submitted. For the following reasons, Defendants' Motions for Summary Judgment will be GRANTED.

## II. BACKGROUND

This case arises from Plaintiff's medical treatment while an inmate at a Michigan Correctional Facility and is brought pursuant to 42 U.S.C. § 1983. In April 2002, Plaintiff entered the Carson City Correctional Facility to serve a twenty-year sentence for a conviction of intent to deliver narcotics. Although Plaintiff was generally in good health, he had suffered from seizures as a child. In May 2002, Plaintiff's seizures resurfaced and he began receiving treatment for this condition. Plaintiff did not experience another seizure until February 18, 2003, when he fell and hit his head, requiring a brief hospital visit. (*See* Pl.'s Ex. A at 5). Plaintiff's CT scan was normal. (*See* Dkt. #44, Ex. F at 61).

On March 6, 2003, Plaintiff reported to the Carson City Hospital emergency room after a guard found him unresponsive in his cell. (*See* Pl.'s Ex. A at 10-14). When Plaintiff arrived at the emergency room, he appeared lethargic but had normal vital signs. (*See id.*). A spinal tap revealed elevated pressure in his spinal fluid and high levels of white blood cells. (*See* Dkt. #44, Ex. F). Later that day, Plaintiff was transferred to Foote Hospital in Jackson, Michigan, where he complained of weakness, nausea, vomiting, headaches, and dizziness. (*See* Dkt. #44, Ex. G at 103). The admitting physician at Foote Hospital initially diagnosed Plaintiff with meningitis, encephalitis, or similar inflammatory disorders. (*See id.* at 17, 29). Plaintiff remained at Foote Hospital until March 18, 2003.

Defendant Freeman (Dr. Freeman) treated Plaintiff during his stay at Foote Hospital, performed a complete neurological examination, and ordered an EEG and an MRI. (*See* Pl.'s Ex. C at 1-8). Based on his examination and the results of testing, Dr. Freeman diagnosed Plaintiff with herpetic meningoencephalitis, likely caused by the herpes virus, which Plaintiff had. (*See id.*). Doctor Freeman eventually discharged Plaintiff to Duane Waters Hospital where he reported in

stable condition with resolving encephalitis and stayed between March 18 and March 24, 2003.

On April 4, 2003, Plaintiff began treatment with Defendant Antonini (Dr. Antonini) at the Cotton Correctional Facility. (*See* Pl.'s Ex. D at 13). Doctor Antonini provided medical care for the Michigan Department of Corrections (MDOC) through MDOC's contract with Correctional Medical Services, Inc. (CMS), an independent medical services provider. At Plaintiff's appointment, Dr. Antonini performed a thorough physical exam and noted that Plaintiff's seizures and herpes were under control, and that he suffered from hypertension. (*See* Dkt. #44, Ex. H at 13-15, 85-86, 88-89; Ex. E 174, 236). The neurological portion of the exam was normal. (*See id.*). Doctor Antonini ordered five different medications to address Plaintiff's encephalitis, seizures, and hypertension, full blood work, chest x-rays, and an MRI. (*See* Dkt. #44, Ex. E at 28). The chest x-ray was normal, which weighed against a diagnosis of sarcoidosis. (*See* Dkt. #44, Ex. H at 84-86).

Three days later, Plaintiff had a follow-up examination with Dr. Freeman at which Plaintiff reported no new problems or symptoms. (*See* Dkt. #44, Ex. E at 174). Doctor Freeman diagnosed Plaintiff with herpes meningoencephalitis with accompanying residual deficits, and recommended that Plaintiff schedule another follow-up appointment. (*See id.*). Doctor Freeman also instructed Plaintiff to seek medical attention if the symptoms that prompted his hospitalization in March returned. (*See id.*). Thereafter, on April 22, 2003, Plaintiff reported to the prison clinic complaining of vertigo, blurred vision, and headaches. (*See* Dkt. #44, Ex. E at 27). Doctor Antonini examined Plaintiff, noted that these were the same symptoms that he experienced in March, and consequently, following MDOC procedure,[1] filled out a form requesting an appointment for Plaintiff with Dr.

---

[1] This procedure required the prisoner's primary doctor, in this case Dr. Antonini, to send a request to CMS via fax that the prisoner needed to receive medical care at a facility outside of the prison, along with any information supporting the request. Once CMS received the request, its nurses would compare the request to national treatment standards in order to determine if the prisoner's situation merited the type of treatment requested. If so, the nurses would send an approval to the primary doctor who would then write an order instructing MDOC's scheduling personnel to schedule the necessary treatment. MDOC was then responsible for scheduling off-site medical care and

Freeman. (*See* Dkt. #44, Ex. H at 22-23; Ex. E at 333). Defendant DeMasi (Dr. DeMasi) authorized the requested appointment with Dr. Freeman.[2] (*See* Dkt. #44, Ex. I at 12). Initially, Plaintiff's neurology appointment was scheduled for May 5, 2003. However, the appointment did not take place as scheduled and, upon learning of this, on May 9, Dr. Antonini requested that the appointment be rescheduled. (*See* Dkt. #44, Ex. H at 22-23). Subsequently, Plaintiff returned to Dr. Antonini on May 14 for refills on his medication at which time Dr. Antonini noted that Plaintiff's condition was unchanged. (*See* Dkt. #44, Ex. H at 24-25; Ex. E at 26).

On June 2, 2003, Plaintiff presented to Dr. Freeman complaining of dizziness for six weeks, weakness and unsteadiness. (*See* Pl.'s Ex. E at 1). Based on his examination, Dr. Freeman recommended that Plaintiff receive an MRI of his brain to determine if any abscesses were present and then schedule a follow-up visit. (*See id.*). After receiving Dr. Freeman's orders on June 6, Dr. Antonini put in a request with CMS for an MRI and a neurological follow-up appointment with Dr. Freeman. (*See* Dkt. #44, Ex. H at 31-32; Ex. E 25, 332). When CMS received the request, the reviewing nurse approved the MRI request, but Dr. DeMasi decided to pend the request for a neurological follow-up to await the MRI results. (*See* Dkt. #44, Ex. J at 63; Ex. I at 17). In the meantime, Dr. DeMasi instructed Dr. Antonini to continue monitoring Plaintiff's condition.

Plaintiff's next appointment with Dr. Antonini occurred on June 11, 2003, at which time Dr. Antonini noted that Plaintiff's condition had not changed in that he still felt weak. (*See* Dkt. #44,

---

arranging for the prisoner to be transported securely.

[2]CMS's nurses were not authorized to deny any request made by a primary doctor but they could delay authorizing the request for more information, which was known as a pend. If the reviewing nurse found that the request could not be authorized he or she would pass the request on to Dr. DeMasi, the Regional Medical Director for Utilization Management for CMS. Doctor DeMasi would then review the request and, based on his experience and research, either authorize the request, pend the request, or not authorize the request. However, Dr. DeMasi did not have any involvement with MDOC's scheduling process or have any control over when treatment would be received.

Ex. H at 39-41; Ex. E at 24, 330). Plaintiff denied experiencing headaches or dizziness at the appointment. (*See id.*). However, three days before the appointment Plaintiff was taken to Foote Hospital after complaining of dizziness and unsteadiness. (*See* Dkt. #44, E at 24). At the hospital a CT scan was performed and was normal. (*See* Dkt. #44, Ex. E 17, 19-20, 162; Ex. G at 285). Doctor Antonini was aware of Plaintiff's trip to Foote Hospital and attributed his symptoms to the fact that Plaintiff's records showed that his blood pressure was not controlled on that date. (*See* Dkt. #44, Ex. H at 40-41). Since Plaintiff's blood pressure was controlled at the time of the appointment on June 11 and Plaintiff only complained of weakness, Dr. Antonini believed that his current symptoms were residual from his encephalitis and scheduled a follow-up visit. (*See id.*).However, five days later Plaintiff fell in his cell after experiencing dizziness. At the prison clinic, Plaintiff informed the nurses that his legs gave out due to weakness and explained that this may have been the result of his medications, which made him feel sluggish. (*See* Dkt. #44, Ex. E at 23). His fall notwithstanding, Plaintiff did not report any new symptoms or request to see Dr. Antonini until August.

On July 17, 2003, Plaintiff underwent the MRI that Dr. Antonini ordered. (*See* Dkt. #44, Ex. E at 144). The MRI showed significant improvement since Plaintiff's first MRI in March and was consistent with Plaintiff's diagnosis of encephalitis. (*See* Dkt. #44, Ex. E at 144; Ex. H at 95-100). After reviewing the MRI results, Dr. Antonini renewed his request for a neurological follow-up pursuant to Dr. Freeman's recommendation. (*See* Dkt. #44, Ex. H at 95-100). However, on July 30, Dr. DeMasi did not authorize this request based on the fact that Plaintiff's MRI showed improvement and did not reveal the presence of any abscesses. (*See* Dkt. #44, Ex. J at 70, 77; Ex. I at 24).

On August 14, 2003, Dr. Antonini examined Plaintiff at the prison clinic and noted that

5

Plaintiff was still experiencing weakness and unsteadiness. (*See* Dkt. #44, Ex. H at 45-46, 104-106; Ex. E at 15). Plaintiff also complained of pain in his right leg and trouble urinating. Based on his examination, Dr. Antonini re-evaluated Plaintiff's medications, prescribed new medication for his difficulty urinating, and ordered complete blood work and a urinalysis. (*See id.*). Doctor Antonini requested that Plaintiff return in two weeks for a follow-up. (*See id.*).

Two weeks later, Plaintiff presented for his follow-up with significant weakness in his legs. (*See* Pl.'s Ex. D at 48-49). Doctor Antonini noted that Plaintiff was having difficulty standing and walking but was not experiencing any nausea, fever, blurred vision or vomiting. (*See id.*). Accordingly, Dr. Antonini ordered that Plaintiff receive a wheelchair and proper accommodations at the prison facility. (*See* Pl.'s Ex. A at 24-25). Dr. Antonini also noted that Plaintiff's intensified symptoms may have been due to his seizure medication and, therefore, ordered blood work to check the medication levels. (*See* Dkt. #44, Ex. H at 48-50; Ex. E at 14). Furthermore, Dr. Antonini appealed Dr. DeMasi's decision to not authorize a neurology appointment. (*See* Pl.'s Ex. D at 42-44). When Dr. DeMasi received the appeal and the new information of Plaintiff's condition, he immediately authorized the appointment. (*See* Pl.'s Ex. F at 3). However, unbeknownst to either Dr. DeMasi or Dr. Antonini, no neurologist was accepting referrals from MDOC or CMS at the time because Dr. Freeman was no longer available. Therefore, CMS notified Dr. Antonini that his request was approved but that no date for the appointment had been scheduled yet. (*See* Dkt. #44, Ex. I at 19). Doctor Antonini next examined Plaintiff on September 3, 2003, and Plaintiff reported that he felt better in the wheelchair but was unable to walk and still experienced weakness. (*See* Dkt. #44, Ex. H at 54-55; Ex. E at 12, 333).

On October 7, Dr. Antonini called Plaintiff out of his cell for an examination and found that Plaintiff was still experiencing weakness and had reported ringing in his ears. (*See* Dkt. #44, Ex. H

6

at 62-65). Therefore, Dr. Antonini recommended that Plaintiff's blood pressure medication be re-evaluated and that he undergo an EKG and follow-up in one week. (*See id*.). Noting that no neurology appointment had been scheduled, Dr. Antonini called CMS to request that Plaintiff receive a neurology appointment as soon as possible. (*See id*.). Doctor Antonini believed that Plaintiff's condition had deteriorated since April and was attempting to accelerate the scheduling of Plaintiff's neurology appointment. (*See id*.).

On October 22, 2003, Plaintiff returned for a follow-up with Dr. Antonini and reported trouble hearing in his left ear, which Dr. Antonini determined was due to blockage, but was otherwise taking all of his medications without side-effects and was eating well. (*See* Dkt. #44, Ex. H at 69, 113-14). Thus, Dr. Antonini ordered an ear-irrigation to clear the blockage and recommended that Plaintiff continue making regular visits. (*See id*.). Nevertheless, this turned out to be the last time Dr. Antonini examined Plaintiff although Plaintiff continued to receive treatment at the prison clinic through November and December.

Finally, on December 29, 2003, Plaintiff was examined by Defendant Verma, (Dr. Verma), the neurologist who had assumed Dr. Freeman's referrals from MDOC. Doctor Verma conducted a complete neurological evaluation, finding Plaintiff had weakness in his both his legs and was unsteady. (*See* Dkt. #44, Ex. E at 4-5). Doctor Verma recommended that Plaintiff undergo another MRI of his brain and entire spine. (*See id.* at 4). During this visit Plaintiff told Dr. Verma that he was going to be released soon and did not want to continue treating within the prison system. (*See* Pl.'s Ex. A at 32-33). In response, Dr. Verma instructed Plaintiff to immediately consult with a doctor on the outside and to follow his recommended treatment plan if Plaintiff was not paroled. (*See id*.).

Plaintiff was released from prison on January 4, 2004, and was diagnosed with neurosarcoidosis in February 2004 following extensive testing. Plaintiff filed the instant action on

7

May 5, 2006, alleging that Defendants were deliberately indifferent to his serious medical needs in violation of the Eighth and Fourteenth Amendments. Defendants have now moved for summary judgment pursuant to FED. R. CIV. P. 56.

### III. LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PRO. 56(c); *accord Turner v. City of Taylor*, 412 F.3d 629, 637 (6th Cir. 2005). "Where the defendant demonstrates that after a reasonable period of discovery the plaintiff is unable to produce sufficient evidence beyond the bare allegations of the complaint to support an essential element of his or her case, summary judgment should be granted." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (citations omitted).

### IV. ANALYSIS

**A. Plaintiff's Eighth Amendment Claim**

"To sustain a cause of action under § 1983 for failure to provide medical treatment, plaintiff must establish that the defendants acted with 'deliberate indifference to serious medical needs.'" *Watkins v. City of Battle Creek*, 273 F.3d 682, 686 (6th Cir. 2001) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). The prisoner's claim consists of an objective and a subjective component. *Carter v. City of Detroit*, 408 F.3d 305, 311 (6th Cir. 2005). The objective component requires the prisoner to demonstrate that a serious medical need existed. *Id.* The subjective component requires a showing that the defendant possessed "a sufficiently culpable state of mind in denying medical

care." *Id.* (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 895 (6th Cir. 2004)). Finally, "[t]his subjective component must be addressed for each [Defendant] individually." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005).

"A defendant possesses a sufficiently culpable state of mind when he acts with deliberate indifference." *Carter*, 408 F.3d at 312. "Deliberate indifference is not mere negligence" but "requires that the defendant[] knew of and disregarded a substantial risk of serious harm to [Plaintiff]'s health and safety." *Watkins*, 273 F.3d at 686. This is a subjective standard and Plaintiff cannot demonstrate deliberate indifference by showing that "there was a danger of which an officer should objectively have been aware." *Id.* Rather, "the official must both be aware of facts from which the inference can be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

**B. Defendant Antonini**

Doctor Antonini was Plaintiff's primary physician between April 2003 and his parole in January 2004. Plaintiff claims that Dr. Antonini was deliberately indifferent to his serious medical needs by failing to diagnose Plaintiff with neurosarcoidosis, to provide adequate medical care, and to treat Plaintiff's need to see a neurologist as an emergency rather than urgent. Thus, Plaintiff argues that if Dr. Antonini "had considered [Plaintiff's] condition ... more seriously, if he had rushed to get [Plaintiff] the neurological appointment that was consistently discussed or even labeled the deteriorating physical condition an emergency, then [Plaintiff] would not have lost the use of his legs." Pl.'s Brief at 17-18. The Court finds that Plaintiff has not presented evidence sufficient to show that Dr. Antonini was deliberately indifferent to Plaintiff's serious medical needs.

The Eighth Amendment does not guarantee adequate medical care but secures Plaintiff's right "not to have his serious medical needs treated with deliberate indifference." *Williams v. Mehra*,

9

186 F.3d 685, 691 (6th Cir. 1999). Thus, "where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). In *Estelle v. Gamble*, the Supreme Court explained:

> An inadvertent failure to provide adequate medical care cannot be said to constitute "an unnecessary and wanton infliction of pain" or to be "repugnant to the conscious of mankind." *Thus a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment*. Medical malpractice does not become a constitutional violation merely because the patient is a prisoner. In order to state a cognizable claim a prisoner must allege acts or omissions sufficiently harmful to evidence a deliberate indifference to serious medical needs.

*Estelle*, 429 U.S. at 106 (emphasis added). Accordingly, "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability *if they responded reasonably to the risk*, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844 (emphasis added).

In light of *Estelle* and its progeny, the Court finds that Plaintiff cannot sustain his claim against Dr. Antonini based on his failure to diagnose Plaintiff with neurosarcoidosis or based on a failure to provide adequate treatment. Dr. Antonini's treatment decisions were based on the objective results of Plaintiff's medical tests and Plaintiff's subjective complaints. Dr. Antonini was presented with a patient who had been consistently diagnosed by a neurologist with encephalitis, who had normal chest x-rays, EKGs, and vital signs, who had a history of seizures and hypertension, and whose condition remained relatively stable for four months. In addition, Plaintiff's MRI showed significant improvement from March to July, was consistent with a person recovering from encephalitis, and without the presence of any abscesses, did not indicate that any further neurological treatment was necessary. Doctor Antonini explained that he was employing a method

known as differential diagnosis in which each symptom was controlled one at a time in order to determine the cause of the patient's condition by process of elimination. *See* Antonini Dep. at 104-108. Thus, Dr. Antonini adjusted his treatments based on Plaintiff's subjective complaints, attempting to eliminate possible sources of his symptoms in order to identify the actual source and treat it accordingly.

Plaintiff has presented no conduct which, absent knowledge of his ultimate condition and diagnosis, would constitute indifference to his condition. Significantly, there is no evidence that Dr. Antonini, ignored Plaintiff's symptoms or complaints, failed to treat Plaintiff, or did less than his training indicated was necessary. *See*, *e.g.*, *LeMarbe v. Wisneski*, 266 F.3d 429, 438-40 (6th Cir. 2001) (concluding the defendant was deliberately indifferent where despite the defendant's knowledge that the prisoner's abdomen contained five liters of bile, that the bile was caused by a leak, that if the leak was not closed the bile would continue to fill the prisoner's abdomen, and that the presence of bile would cause serious harm, the defendant failed to take the actions his training indicated were necessary by failing to close the leak or contact a surgeon capable of closing the leak, and failing to make immediate arrangements for the prisoner to see a specialist who could render proper treatment). In the absence of such evidence, Plaintiff's claim is merely a disagreement with Dr. Antonini's medical judgment or at most a claim of medical malpractice, which does not amount to deliberate indifference for purposes of the Eighth Amendment.

Similarly, the Court is not persuaded by Plaintiff's assertion that by treating Plaintiff's condition as urgent rather than an emergency Dr. Antonini was deliberately indifferent. Doctor Antonini explained that he classified Plaintiff's need to see a neurologist as urgent as opposed to an emergency because Plaintiff's condition, although serious, was chronic rather than acute. *See* Antonini Dep. at 99, 108-110. In other words, Plaintiff's condition was stable: Plaintiff's only

11

consistent complaint was weakness and he did not display any symptoms, such as fever, that required immediate hospitalization. Doctor Antonini further explained that Plaintiff's weakness and unsteadiness could have been attributable to multiple causes such as hypertension, Plaintiff's medications, or the residual effects of encephalitis. *See id.* at 104-108. Further the objective medical evidence did not reveal any cause for immediate concern. Doctor Antonini also did not believe that Plaintiff would receive the type of neurological treatment he needed by going to the emergency room. *See id.* at 20-21. The evidence demonstrates a considered medical decision, which while possibly incorrect or even extremely negligent, is not deliberate indifference. *See Brooks v. Celeste*, 39 F.3d 125, 129 (6th Cir. 1994) (finding that repeatedly violating an objective standard of reasonableness is not necessarily the same as deliberate indifference and recognizing that "[t]he official may be incompetent, but he is not acting wantonly, and thus, is not inflicting 'punishment'").

In contrast, Plaintiff has presented no evidence to evaluate the comparative risks of treating Plaintiff's condition on an urgent basis as opposed to an emergency basis. There is no evidence that Plaintiff would have received neurological treatment or proper diagnostic testing any sooner if he had been sent to the emergency room rather than following the normal procedure for such treatment on an urgent basis. *See Williams*, 186 F.3d at 692 (finding that the plaintiff could not show the defendants were deliberately indifferent to the risk that the prisoner would hoard pills in order to commit suicide where there was no evidence that the defendants knew that receiving pills in a pill line was less effective at preventing hoarding that prescribing liquid medication). Also, Plaintiff has not presented any evidence of alternative treatment or testing that Dr. Antonini's training indicated was necessary. *See LeMarbe*, 266 F.3d at 438-40. Consequently, there is no basis for concluding that Dr. Antonini's decision was so irrational that it amounted to deliberate indifference.

This case is distinguishable from those on which Plaintiff relies where the physicians, despite

knowing of the serious medical needs and providing some treatment, either completely failed to address the prisoners' needs or did less than their medical training indicated was necessary. *See Terrance v. Northville Regional Psych. Hosp.*, 286 F.3d 834 (6th Cir. 2002); *McGelligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999). In *McGelligott* the defendant was aware of the prisoner's severe pain the entire time he was incarcerated, that the prisoner's condition continually deteriorated from visit to visit, and that the prescribed medication was not working. *See McGelligot*, 182 F.3d at 1257-58. Despite this knowledge, the doctor permitted significant delays in treatment, often continued the ineffective medications without even examining the prisoner, failed to prescribe medication to address the prisoner's severe pain, and failed to order diagnostic tests. *See id.* Similarly, in *Terrence* the defendant violated hospital protocol by failing to prevent the prisoner from engaging in physical activities on an extremely hot and humid day despite knowing that the prisoner was obese, diabetic, and on medications that significantly increased the risk of heat stroke. *See Terrance*, 286 F.3d at 844-45. Further, the defendant in *Terrance* took over an hour to respond to the prisoner's emergency situation without providing any explanation. *See id.*

In contrast to *McGelligot*, Dr. Antonini did not thoughtlessly continue with the same treatment under circumstances where Plaintiff's condition continued to deteriorate. Furthermore, the fact that Plaintiff's condition did not improve, on its own, does not demonstrate that Dr. Antonini was deliberately indifferent. *See Farmer*, 511 U.S. at 844 (stating a defendant may escape liability if he acted reasonably even if the ultimate harm was not averted). Unlike *McGelligott*, where the defendant continued to treat the prisoner with the same medications despite knowing that they did not address his pain and that the prisoner's condition was continually getting worse, Dr. Antonini attempted to adapt his treatment to Plaintiff's needs. In fact, unlike *McGelligott*, Dr. Antonini actively requested diagnostic testing and did not await test results before attempting to address

13

Plaintiff's complaints. Moreover, unlike *Terrence*, there is no evidence that Dr. Antonini violated any hospital protocol or completely ignored Plaintiff's symptoms.

Finally, there is no evidence from which the jury could conclude that Dr. Antonini was responsible for Plaintiff's inability to see a neurologist between August 29, 2003, and December 29, 2003. While the Court is concerned with the length of time Plaintiff had to wait to see a neurologist, this problem appears to be systematic and not attributable to Dr. Antonini. These issues have been the subject of extensive litigation in the Western District of Michigan, *see Hadix v. Caruso*, No. 92-110, and involve MDOC as well as CMS; however, neither MDOC nor CMS is a party to this action and Plaintiff's only claims are against the doctors as individuals. As such, "personal liability on any of the defendants ... must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others ...." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991). *See also Clark-Murphy v. Foreback*, 439 F.3d 280, 291 (6th Cir. 2006). Thus, the fact that MDOC's system may be flawed does not necessarily indicate that Dr. Antonini was deliberately indifferent. *See Wilson v. Seiter*, 501 U.S. 294, 302 (1991) (quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986), and concluding that deliberate indifference "does not have a fixed meaning but must be determined with 'due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged'").

In the present case, the evidence demonstrates that Dr. Antonini made repeated efforts to secure Plaintiff an appointment with a neurologist as reflected in his orders and progress notes. In addition Dr. Antonini continued to treat Plaintiff during this time period. Importantly, the delay was caused in part by the fact that a neurologist was not available to see patients for a period of time. The Court also finds it significant that even after CMS approved his requests, Dr. Antonini nevertheless continued his efforts to get Plaintiff an appointment rather than simply relying on CMS's assurances.

*See Clark-Murphy*, 439 F.3d at 287 (finding two of the defendants responded reasonably to the plaintiff's needs and, thus, were not deliberately indifferent, where they reasonably believed that the plaintiff would receive the appropriate care); *Davis v. Oakland County*, No. 96-1678, 1998 WL 180608, at *4 (6th Cir Apr. 7, 1998) ("It was not unreasonable" for defendant "to assume that the trained medical professional ... would follow-up in an appropriate manner"). Finally, it is undisputed that Dr. Antonini had no control over when appointments would be scheduled. Thus, there is no evidence that Dr. Antonini was deliberately indifferent to Plaintiff's need to see a neurologist.

In sum, Plaintiff's claims against Dr. Antonini are either insufficient to state a claim under the Eighth Amendment or unsupported by the record. Accordingly, Dr. Antonini is entitled to summary judgment.

## C. Defendant DeMasi

Plaintiff claims that Dr. DeMasi was deliberately indifferent to his serious medical needs by misdiagnosing Plaintiff, by prescribing incorrect medications, and by not immediately authorizing his request for a neurological follow up in June 2003.[3] The Court finds that Plaintiff has not presented evidence that Dr. DeMasi was deliberately indifferent to Plaintiff's serious medical needs.

Medical decisions not to order diagnostic testing do not represent cruel and unusual punishment and are at most medical malpractice. *See Estelle*, 429 U.S. at 107. The Sixth Circuit applied this principle in *Durham v. Nu'man*, 97 F.3d 862 (6th Cir. 1996). In *Durham*, the court held that the defendant was not deliberately indifferent when he failed to order x-rays despite the prisoner's complaints that his arm was broken where the prisoner's arm showed no objective signs of a break, the type of break the prisoner suffered ordinarily did not show objective symptoms for

---

[3] It is not disputed that Dr. DeMasi never personally treated Plaintiff, prescribed medication, or was responsible for doing so. Thus Plaintiff's claims are without merit to the extent they are based on Dr. DeMasi's diagnosis or treatment, and warrant no further discussion.

15

24-36 hours, and it was common for x-rays not to be taken immediately following these types of injuries. *See id.* at 865.

The evidence of record shows that Dr. DeMasi's single decision to not authorize the neurological follow-up was considered and based on his medical judgment. As in *Durham*, Dr. DeMasi declined to order diagnostic testing based on his interpretation of objective information regarding Plaintiff's condition. Doctor DeMasi never treated Plaintiff personally and his decision to deny the neurological follow-up was based on Plaintiff's MRI, which showed significant neurological improvement since March and was consistent with Dr. Freeman's findings.[4] Further, similar to *Durham*, Plaintiff's MRI was normal for a person recovering from encephalitis. Significantly, just as in *Durham*, Dr. DeMasi approved Dr. Antonini's request for a neurological follow-up immediately upon receiving new information regarding Plaintiff's condition. Therefore, as the court concluded in *Durham*, Dr. DeMasi's failure to approve the neurological follow up did not amount to deliberate indifference to Plaintiff's serious medical needs. Thus, Dr. DeMasi is entitled to summary judgment.

**D. Defendant Freeman**

Dr. Freeman provided neurology consultations for Plaintiff in connection with Plaintiff's hospital stay in March 2003. Based on Plaintiff's symptoms, MRI and EEG results, and other medical tests, Dr. Freeman diagnosed Plaintiff with meningoencephalitis probably resulting from the herpes virus. Based on this diagnosis, Dr. Freeman treated Plaintiff accordingly. Thereafter, Dr. Freeman examined Plaintiff twice more at the prison clinic. Specifically, on June 2, 2003, Dr. Freeman examined Plaintiff and recommended that he undergo an MRI and schedule a follow-up.

---

[4] Although Plaintiff claims that Dr. DeMasi believed that the MRI results were not normal, Dr. DeMasi clearly stated that while the MRI results would not be normal for a healthy person, they were consistent with a person recovering from encephalitis such as Plaintiff.

16

This was the last time Dr. Freeman treated Plaintiff.

Based on these facts, Plaintiff argues that Dr. Freeman was deliberately indifferent to his serious medical needs because Dr. Freeman misdiagnosed him and, as a result, failed to treat him for neurosarcoidosis. Plaintiff has presented no evidence that Dr. Freeman refused or delayed to examine or treat Plaintiff, or that Dr. Freeman did not exercise medical judgment in providing care to Plaintiff. Plaintiff merely states that had Dr. Freeman diagnosed him with sarcoidosis, things may have turned out differently. The Court finds that Plaintiff's argument is nothing more than a claim that Dr. Freeman was negligent in diagnosing and treating Plaintiff. Accordingly, Dr. Freeman is entitled to summary judgment.

## E. Defendant Verma

Doctor Verma examined Plaintiff once prior to his release from prison. Plaintiff has not presented any evidence that Dr. Verma was deliberately indifferent to his condition. At the time of his appointment with Dr. Verma, Plaintiff told him that he was going to be paroled and that he preferred to receive treatment outside of the prison system. As such, Dr. Verma informed Plaintiff that he could not treat Plaintiff's condition once Plaintiff was released. Doctor Verma further instructed, and Plaintiff understood, that when Plaintiff was released he should contact an outside physician as soon as possible and arrange a neurological examination. Plaintiff was released within one week of this visit. In addition, Dr. Verma recommended a course of treatment to be implemented by his primary doctor at the prison in the event that Plaintiff was not paroled in the near future.

Plaintiff has provided no other evidence regarding his one visit with Dr. Verma. Aside from the fact that Dr. Verma did not cure Plaintiff's condition, he has neither alleged nor provided any evidence of deliberate indifference. On the contrary all of the evidence regarding Dr. Verma demonstrates that he informed himself of Plaintiff's medical condition, examined Plaintiff, and

exercised his medical judgment based on the facts before him. Based on this showing, the Court concludes that there is no evidence from which a reasonable jury could find that Dr. Verma was deliberately indifferent to Plaintiff's serious medical needs. Accordingly, Dr. Verma is entitled to summary judgment.

**F. Defendant Hutchinson**

Plaintiff's claim against Dr. Hutchinson is based solely on a theory of supervisory liability. "The established law is clear that someone in a supervisory capacity ... must have at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending employee." *Durham*, 97 F.3d at 869. Plaintiff has presented no evidence that Dr. Hutchinson implicitly authorized, approved, or knowingly acquiesced in any of the conduct Plaintiff claims to be unconstitutional. Therefore, Dr. Hutchinson is entitled to summary judgment.

## V. CONCLUSION

Based on the reasons set forth above, the Court concludes that Plaintiff has failed to demonstrate that Defendants were deliberately indifferent to his serious medical needs. Accordingly,

IT IS ORDERED that Defendants' Motions for Summary Judgment are GRANTED and that Plaintiff's claim is DISMISSED.

IT IS SO ORDERED.

                                                s/Lawrence P. Zatkoff
                                                LAWRENCE P. ZATKOFF
                                                UNITED STATES DISTRICT JUDGE

Dated: August 15, 2007

CERTIFICATE OF SERVICE

      The undersigned certifies that a copy of this Order was served upon the attorneys of record by electronic or U.S. mail on August 15, 2007.

                                                    s/Marie E. Verlinde
                                                   Case Manager
                                                   (810) 984-3290